Michelle Gold, Esq.  230835
THE GOLD FIRM™
PO Box 1314
Bonita, CA 91908
(619) 977-1672

In Pro Per
On behalf of Plaintiffs/Proposed Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DIVISION

MICHELLE GOLD, individually and as
Trustee of The Michelle Gold Separate
Property Trust Dated December 23, 2002 aka
The Gold Family Trust; STAR MARTINEZ,
Trustee; GONZALEZ-GOLD, individually
and on behalf of herself and on behalf of all
others similarly situated (proposed class), and
DOES 1-5000,

Plaintiffs

vs.

US BANCORP; US BANK;  BIRDROCK
HOME MORTGAGE, LLC, STEPHEN
NIEDNAGEL; DANIEL NIEDNAGEL;
ALLY FINANCIAL, INC. F/ICJA GMAC
LLC; BANC OF AMERICA FUNDING
CORPORATION; BANK OF AMERICA
CORPORATION; BANK OF AMERICA,
NATIONAL ASSOCIATION; BARCLAYS
CAPITAL INC.; BARRY J. O'BRIEN;
BCAP LLC; BEAR STEARNS ASSET
BACKED SECURITIES I LLC; CAPITAL
ONE FINANCIAL CORPORATION;
CAPITAL ONE, NATIONAL
ASSOCIATION; CI-MVY CHASE
FUNDING LLC; CHRISTOPHER M.
O'MEARA; CITICORP MORTGAGE
SECURITIES, INC.; CITIGROUP
FINANCIAL PRODUCTS, INC.;

Case No. **'23 CV 1342 GPC DDL**

[Proposed Class Certification]

RICO COMPLAINT

FOR RESCISSION; INJUNCTION;
DECLARATORY RELIEF, AND
DAMAGES PURSUANT TO THE
RACKETEER INFLUENCED AND
CORRUPT PRACTICES ACT 18 U.S.C. §§
1961-1968 et.seq; FALSE CLAIMS ACT 31
U.S.C. §3729 et seq.;

**REQUEST FOR JURY TRIAL**

RICO COMPLAINT                    1

--

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CITIGROUP GLOBAL MARKETS INC.;
CITIGROUP GLOBAL MARKETS
REALTY CORP.; CITIGROUP INC.;
CITIGROUP MORTGAGE LOAN TRUST
INC.; CITIMORTGAGE, INC.;
COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE HOME
LOANS, INC.; COUNTRYWIDE
SECURITIES CORP.; CREDIT SUISSE
(USA), INC.; CREDIT SUISSE FIRST
BOSTON MORTGAGE SECURITIES
CORP.; CREDIT SUISSE HOLDINGS
(USA), INC.; CREDIT SUISSE
SECURITIES (USA) LLC; CWALT, INC.;
CW/VIBS, INC.; DB STRUCTURED
PRODUCTS, INC.; DB U.S. FINANCIAL
MARKET HOLDING CORPORATION;
DEUTSCHE ALT-A SECURITIES, INC.;
DEUTSCHE BANK SECURITIES INC.;
DLJ MORTGAGE CAPITAL, INC.;
EDWARD GRIEB; EMC MORTGAGE
CORPORATION; FITCH, INC.; GMAC
MORTGAGE GROUP LLC F/KJA GMAC
MORTGAGE GROUP, INC.; GOLDMAN,
SACHS & CO.; IMEI ASSETS CORP.;
WIPAC FUNDING CORPORATION;
IMPAC MORTGAGE HOLDINGS, INC;
BOAC SECURED ASSETS CORP.; J.P.
MORGAN ACCEPTANCE
CORPORATION I; J.P. MORGAN
MORTGAGE ACQUISITION CORP.; J.P.
MORGAN SECURITIES LLC F/KJA
BEAR, STEARNS & CO. INC . AND J.P.
MORGAN SECURITIES INC.; JAMES J.
SULLIVAN; JPMORGAN CHASE & CO.;
JPMORGAN SEC-URI-T LES HOLDINGS .
LLC; KRISTINE SMITH; LANA FRANKS;
MARK L. ZUSY; MERRILL LYNCH &
CO., INC.; MERRILL LYNCH .
MORTGAGE INVESTORS, INC.;
MERRILL LYNCH MORTGAGE
LENDING, INC.; MERRILL LYNCH,
PIERCE, FENNER & SMITH
INCORPORATED; MOODY' S
CORPORATION; MOODY'S INVESTORS
SERVICE, INC.; MORGAN STANLEY;
MORGAN STANLEY & CO. INC.;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

RICO COMPLAINT                                    2

--

MORGAN STANLEY CAPITAL  I INC.;     )
MORGAN STANLEY MORT GAGE           )
CAPITAL HOLDINGS LLC; MORTGAGE     )
ASSET SECURITIZATION               )
TRANSACTIONS, INC.; MORTGAGE IT    )
SECURITIES CORP.; MORTGAGE IT,     )
INC.; NOMURA AS SET ACCEPTANCE     )
CORPORATION; NOMURA CREDIT &       )
CAPITAL, INC.; NOMURA HOLDING -    )
AMERICA, INC.; NOMURA SECURITIES   )
INTERNATIONAL, INC.; RBS           )
ACCEPTANCE INC. F/K/A GREENWICH    )
CAPITAL ACCEPTANCE, INC.; RBS      )
FINANCIAL PRODUCTS INC. F/K/A      )
GREENWICH CAPITAL FINANCIAL        )
PRODUCTS, INC.; RBS HOLDINGS USA   )
INC. F/K/A GREENWICH CAPITAL       )
HOLDINGS, INC.; RBS SECURITIES INC.)
F/ICJA GREENWICH CAPITAL           )
MARKETS, NC.; RESIDENTIAL          )
ACCREDIT LOANS, INC.; RESIDENTIAL  )
FUNDING COMPANY, LLC F/ICJA        )
RESIDENTIAL FUNDING                )
CORPORATION; RICHARD MCICINNEY;    )
RICHARD S. FULD, JR.; SAMI1R TABET;)
SANDLER O'NEILL + PARTNERS,• L.P.; )
STANDARD & POOR'S FINANCIAL        )
SERVICES LLC; STRUCTURED ASSET     )
MORTGAGE INVESTMENTS II INC.;      )
THE BEAR STEARNS COMPANIES LLC     )
F/K/A THE BEAR STEARNS             )
COMPANIES INC.; THE MCGRAW-HILL    )
COMPANIES, UBS AMERICAS            )
INC.; UBS REAL ESTATE SECURITIES   )
INC.; TIES SECURITIES LLC; WAMIJ   )
CAPITAL CORP.; WELLS FARGO &       )
COMPANY; WELLS FARGO ASSET         )
SECURITIES CORPORATION; WELLS      )
FARGO BANK, NATIONAL               )
ASSOCIATION; STEVEN BRUCE GOLD;    )
ARLENE MARIE ARIAS aka ARLENE      )
MARIE CAMPBELL; HAROLD G.          )
CAMPBELL; KARL SCHORR,; JOE        )
SOECKER; MATTHEW D. MURPHEY,       )
individually; TROUTMAN SANDERS LLP;)
ROBERT PIZZUTO; SUSAN R. SAKHAI;   )
RALPH HUGHES; GEORGE E.            )

RICO COMPLAINT                  3

OLMSTEAD; TYLER W. CRAMER; )
HUGHES & PIZZUTO, A.P.C. aka )
OLMSTEAD, CRAMER & PIZZUTO, )
A.P.C.; JEANNE MAX; JOHN PIETERS, )
MAX and PIETERS, CPA, a California )
Professional Corporation aka Pieters and )
Associates aka Jeanne Max and Associates; )
and DEFENDANTS JOHN DOE 1-50, )
)

Defendants.
_____)

PLAINTIFFS, individually, as Trustees, and on behalf of all others similarly situated (proposed Class Members easily distinguished as homeowners with mortgages held in any of the MBS Trusts listed in Exhibit "A"), by and through their attorney Michelle Gold and THE GOLD FIRM™, file this Verified Complaint against DEFENDANTS and allege as follows:

## I. INTRODUCTION

1.      PLAINTIFFS  file this action seeking in part, an EMERGENCY INJUNCTION STAYING A WRIT OF EVICTION scheduled TO BE ENFORCED TOMORROW, JULY 21, 2023, at 6:00 am. PLAINTIFFS' require additional time to seek and obtain new judgment.

2.      PLAINTIFFS intend on keeping the home and have already served and had [i]filed Notices of Appeal wrongful eviction and separate Federal Rico Cases. Moreover, newly discovered evidence, including, but not limited to Findings of Fact issued by 3rd party Government Agent, Officials, Investigators and Judicial and Officers.

3.      PLAINTIFFS 3day notice is insufficient time to move and will suffer irreparable harm if injunction if Injunction is denied. PLAINTIFFS have been dealing with severe health issues, unlawful depletion of funds and if evicted into the streets tomorrow, health will likely decline causing irreparable damage. PLAINTIFFS are the legal owners of the property and DEFENDANTS must be ordered to transfer title SP Docs of their home illegally seized with forged and fraudulent documents. MBS Trusts listed in Exhibit A.

4.      DEFENDANTS do not and cannot obtain original mortgage and/or notes for any of the residential properties whose title is allegedly held under any of the MBE Trusts listed in Exhibit A because the mortgages and loans no longer exist or never existed. Moreover, DEFENDANTS have already testified numerous times the documents do not exist.

RICO COMPLAINT                              4

--

5.      Without proof of legal title and a clear Chain of Title from original lenders to DEFENDANTS, DEFENDANTS are without legal authority to proceed with foreclosure or eviction of any homeowner whose loan is held by these MBS Trusts listed in Exhibit A.

6.      In PLAINTIFFS case, PLAINTIFFS can provide proof her original 2006 application with Virtual Bank that DEFENDANTS illegally modified to increase from $367,000 to $599,000 solely to pay off unknown 3rd party debts, depleting PLAINTIFFS equity before illegally piggy backing those loans to PLAINTIFFS mortgage leaving PLAINTIFFS with the liability. All illegal and criminal action warrant federal and government investigations and tracing of PLAINTIFFS (and all other American Homeowner) payments and assets illegally seized by DEFENDANTS for themselves and for the benefit of 3rd parties.

7. The discovery that mortgage documents were regularly being used in foreclosures across the country that, among other defects, were backdated, had falsely stated dates of transfer, had fraudulent notarizations, had forged signatures, were signed by employees of the servicers or document preparers who often falsely claimed to be officers of the originating banks and other entities up the chain of assignments, and were "robosigned" (i.e., signed in bulk).

8.      Such fraudulent assignments and note endorsements formed the basis for the submission of at least tens of thousands of false claims to the U.S. Department of Housing and Urban Development ("HUD") for payments pursuant to the mortgage insurance program administered by the Federal Housing Administration ("FHA"). To add insult to injury, not only did Defendants use the fraudulent assignments and endorsements to procure insurance payments from HUD, they also charged HUD for the cost of filing the fraudulent documents in the foreclosure proceedings. In furtherance of funding and concealing the criminal acts and racketeering organization created to illegally seize loan payments, government bailout payments, TARP payments DEFENDANTS lined their pockets with instead of passing the benefit to the homeowners as intended. DEFENDANTS and their greed are now taking advantage of American Homeowners affected by the Global Covid Pandemic, and foreclosing on the same properties DEFENDANTS have already been compensated for 2 or 3 times over between 2006-2023.

9.      DEFENDANTS concealment of criminal acts and the criminal acts of employees and 3rd party co-conspirators continues to create further issues for American Homeowner who have been denied mortgage assistance, and are now threatened by foreclosure.

10.     On May 13, 2015, the ruling came in a case brought by the federal government against Royal Bank of Scotland and Japanese Bank Nomura Holdings. RBS and Nomura were  the only two of 18 banks (Defendants) sued by the government that took their cases to trial. Others like Bank of America and JP Morgan, elected to settle.

11.     When DEFENDANTS Nomura and RBS argued that it was the housing crash argued that it was the housing crash, not deceptive practices on their part that caused the bonds they sold to Fannie and Freddie to tank, Judge Denise L. Cote dismissed the argument issued in 361-page decision. Normura and RBS faced $805 million in damages.

12.     In addition to seeking damages for the false claims submitted to HUD, this action is also brought to recover damages and penalties arising from the purchase by the STRICKEN 2 United States ("U.S.") government, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Rhode Island, and Virginia, the District of Columbia, the City of Chicago, and the City of New York (the "Government Plaintiffs" in another case) of securities in some of the 3,550 private-label residential mortgage-backed securities trusts that used the fraudulent mortgage assignments and note endorsements in most of the foreclosures they pursued after 2008 and in bankruptcies, where the trusts sought relief from the automatic bankruptcy stay in order to foreclose on trust assets (the "MBS Trusts).

13.     The notes and other mortgage documents, including lawfully executed mortgage assignments, were required to have been delivered at the inception of the MBS Trust, and Defendants repeatedly certified that the MBS Trusts complied with that requirement. 6. When the trustee and custodian banks and servicers discovered that the mortgage assignments were missing, they, together with the default management and/or mortgage loan documentation companies, devised and operated a scheme to replace the missing assignments with fraudulent, fabricated assignments. Likewise, to conceal that the MBS Trusts were never assigned the notes, the trustee and custodian banks, in concert with the mortgage servicing companies (which needed possession of the note to foreclose), prepared and filed thousands of affidavits falsely representing that the MBS Trusts had possession of the note and that the note was lost in unknown circumstances. 7. These fraudulent documents—usually assignments of the mortgage—were then filed in court to persuade the court that the trust was the proper party to foreclose on the mortgage. 8. The Defendants concealed that the notes and assignments were never delivered to the MBS Trusts, and

disseminated false and misleading statements to the investors, including the Government Plaintiffs, to obtain the payment of fees for services that were not performed or were performed fraudulently.

14.     The Government Plaintiffs that purchased securities issued by the MBS Trusts have been harmed by: (i) the resulting impaired value of the purchased securities; (ii) overcharges for fraudulent services and expenses and for services not provided, imposed by the Defendant trustees, custodians, mortgage servicers, and default management and/or mortgage loan documentation companies, as well as by law firms; and (iii) the increased costs to prove good title to the mortgages purportedly in the MBS Trust asset pools, since the supporting documents are missing or forged.

15.

The Defendants named herein are (i) the trustees that control the MBS Trusts whose assets consist of pools of residential mortgages in California and throughout the United States; (ii) the custodians that, as agents of the trustees, are charged with safeguarding the mortgage assets and related documents of the MBS Trusts; (iii) the mortgage servicing companies that manage the day-to-day operations of the payment processing and foreclosure proceedings for the MBS Trusts at the direction of the trustee banks; and (iv) the default management and/or mortgage loan documentation companies that assisted with foreclosures for the MBS Trusts and mortgage guarantee claims submitted to HUD.

16.     The fraud carried out by the Defendants in this case includes, inter alia: Mortgage assignments with forged signatures of the individuals signing on behalf of the grantors, and forged signatures of the witnesses and the notaries;  Mortgage assignments with signatures of individuals signing as corporate officers for banks and mortgage companies that never employed them;  Mortgage assignments prepared and signed by individuals as corporate officers of mortgage companies that had been dissolved by bankruptcy years prior to the assignment;  Mortgage assignments with purported effective dates unrelated to the date of any actual or attempted transfer (and in the case of trusts, years after the closing date of the trusts); Mortgage assignments prepared on behalf of grantors who had never themselves acquired ownership of the mortgages and notes by a valid transfer, including numerous such assignments where the grantor was identified as "Bogus Assignee for Intervening Assignments"; and Mortgage assignments notarized by notaries who never witnessed the signatures that they notarized.

RICO COMPLAINT                                    7

17.     The Defendants may have used these fraudulent assignments and note endorsements because the original loan documents were never delivered to the MBS Trusts; or because the original loan documents were defective; or because the original loan documents were delivered but subsequently destroyed; or because the servicers used fraudulent document production as a revenue source; or because of ineptitude. Regardless of any justification or excuse, a multitude of fraudulent documents were used in foreclosure proceedings on MBS Trust assets and formed the basis for false claims on mortgage guarantees from HUD.

## II.  JURISDICTION AND VENUE

18.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the state and municipal False Claims Acts pursuant to 28 U.S.C. § 1367.

16. This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in South Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in South Carolina.

19.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the California and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the 16. This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants subject matter of this lawsuit in California and numerous acts proscribed by  31 U.S.C. § 3729 occurred in California.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the California and numerous acts proscribed by  31 U.S.C. § 3729 occurred in California.

 PLAINTIFFS

21.     PLAINTIFFS claims are brought pursuant to the federal False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA") and similar provisions in the state and municipal False Claims Act indicated herein. On behalf of the Government Plaintiffs, Relator seeks to recover damages and civil penalties arising from the false claims and false statements made by the Defendants.

//

//

DEFENDANTS

22.     Defendant AMC MORTGAGE SERVICES, INC., is a corporation formed under the laws of the State of Delaware.  Prior to August 31, 2007, AMC MORTGAGE SERVICES was a subsidiary of ACC Capital Holdings Corporation, based in Orange, California, but on that date was sold to CITIGROUP, INC. and became part of CITI RESIDENTIAL LENDING, INC., a corporation formed under the laws of the State of Delaware.  In 2009 and 2010, CITI RESIDENTIAL LENDING, INC. was merged into CITIMORTGAGE,  INC.  ("AMC/CITI"), a corporation formed under the laws of the State of New York.  Defendants CITI RESIDENTIAL LENDING, INC. and CITIMORTGAGE, INC. are both subsidiaries of CITIGROUP, INC., based in New York,  New York.   AMC/CITI's  corporate  headquarters are located at 1000 Technology Drive, O'Fallon, Missouri.

23. Defendant AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMS")  is  a corporation  formed  under  the  laws  of  the  State  of  Delaware.   AHMS operates service centers in Irvine, California, Jacksonville, Florida, and Pune, India. AHMS'  corporate  headquarters  are located at 1525 South Beltline Road, Coppell, Texas.  AHMS changed its name to Homeward Residential, Inc. in February 2012 and was acquired by Defendant OCWEN October 2012.

24. Defendant AURORA LOAN SERVICES,  LLC  ("AURORA")  is  a  corporation formed under the laws of the State of Delaware.  AURORA's  corporate  headquarters are located at 10350 Park Meadows Drive, Littleton, Colorado.

25. Defendant  BAC  HOME  LOANS  SERVICING,  LP  ("BAC")  is  a  partnership formed under the laws of the State of Texas.  It was formerly known as COUNTRYWIDE HOME LOANS SERVICING LP and, in 2011, was succeeded by merger by BANK OF AMERICA, N.A., a subsidiary of Defendant BA.  BAC operates from Arizona and Texas and is based in 4500 Park Granada, Calabasas, California.

26. Defendant BANC OF AMERICA MORTGAGE SECURITIES, INC. ("BAMS")  is  a corporation  formed  under  the  laws  of  the  State  of  Delaware.   BAMS' headquarters  are located at 214 North Tryon Street, Charlotte North Carolina.

27. Defendant BANK  OF  AMERICA  CORPORATION  ("BA")  is  a  corporation formed  under  the  laws  of  the  State  of  Delaware.   BA's  corporate  headquarters are located at Bank of America Corporate Center, 100 North Tryon Street, Charlotte,  NorthCarolina.  BA is successor-in-interest to COUNTRYWIDE FINANCIAL CORPORATION and LASALLE BANK CORPORATION.

30.     Defendant THE BANK OF NEW YORK MELLON CORPORATION ("BONY") is a national bank.   BONY's corporate headquarters are located at One Wall Street, New York, New York.

31.     Defendant BAYVIEW LOAN SERVICING, LLC ("BAYVIEW") is a corporation formed under the laws of the State of Delaware. BAYVIEW's headquarters are located at 4425 Ponce de Leon Blvd., 4th floor, Coral Gables, Florida.

32.     Defendant CALIBER HOME LOANS, INC. f/k/a VERICREST FINANCIAL, INC. ("VERICREST") is a corporation formed under the laws of Delaware.   VERICREST's corporate headquarters are located at 715 S Metropolitan Avenue, Oklahoma City, Oklahoma.  In 2009, Lone Star Funds acquired the home lending business platform of CIT Group Inc., including The CIT Group/Sales Financing, Inc., a Delaware corporation.  Following the acquisition, the name of The CIT Group/Sales Financing, Inc. was changed to Vericrest Financial, Inc., which was subsequently changed to Caliber Home Loans, Inc.

33.     Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a corporation formed under the laws of the State of California. CRC's corporate headquarters are located at 9200 Oakdale Ave, Ste. 100, Chatsworth, California.  It operates as a subsidiary of Defendant CHASE.  In December 2013, CHASE sold many of CRC's assets to ALAW.

34.     Defendant CARRINGTON MORTGAGE SERVICES ("CARRINGTON") is a corporation formed under the laws of the State of California. CARRINGTON's  Florida.

40.     Defendant HOMEQ SERVICING CORPORATION d/b/a/ BARCLAYS CAPITAL REAL ESTATE, INC. ("BARCLAYS") is a  corporation formed under the laws of the State of Delaware.  BARCLAYS is a subsidiary of Barclays PLC based in London, England. BARCLAYS'  corporate  headquarters are located at 4837 Watt Avenue, North Highlands, California.  BARCLAYS operates from 301 S. College Street, Charlotte, North Carolina.  In 2010, Barclays PLC sold BARCLAYS (i.e., HOMEQ SERVICING CORPORATION) to Defendant OCWEN for $1.3 billion.

41.     Defendant HSBC BANK USA, NATIONAL ASSOCIATION ("HSBC"), is a national bank.  HSBC is a subsidiary of HSBC USA, INC., which, in turn, is a subsidiary of HSBC NORTH AMERICA HOLDINGS, INC.  HSBC HOLDINGS PLC, based in London, England, is the parent company of HSBC NORTH AMERICA

HOLDINGS, INC.  HSBC's  corporate  headquarters  are located at 1800 Tysons Boulevard, McLean, Virginia.

42.      Defendant HSBC MORTGAGE SERVICES INC.  ("HSBC  MORTGAGE") is a corporation formed under the laws of the  State  of  Delaware.  HSBC  MORTGAGE's principal place of business is 636 Grand Regency Blvd., Brandon, Florida.

43.      Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION ("CHASE")  is  a  national  bank.  CHASE is a subsidiary of JP Morgan Chase & Co. CHASE's  headquarters are located at 270 Park Avenue, New York, New York.  On May 30, 2008, CHASE parent JP Morgan Chase & Co. acquired The Bear Stearns Companies, Inc., now The Bear Stearns Companies, LLC.  On September 25, 2008, CHASE purchased the assets and assumed certain liabilities of Washington Mutual Bank.

44.      Defendant  LENDER  PROCESSING  SERVICES,  INC.  ("LPS")  is  a corporation  formed  under  the  laws  of  the  State  of  Delaware.    LPS's corporate headquarters are located at 601 Riverside Avenue, Jacksonville, Florida.  In May, 2013, Lender Processing Services announced its acquisition by Fidelity National Financial, Inc., the nation's largest title insurance company. Lender Processing Services was reorganized into Black Knight Financial Services, Inc. and ServiceLink Holdings, LLC.

mortgage loans with an aggregate principal balance of $41.2 billion.

40.      Defendant  NATIONWIDE  TITLE  CLEARING  INC.  ("NTC")  is Defendant  LITTON  LOAN  SERVICING  LP  ("LITTON")  is  a  corporation  formed under the laws of Texas. LITTON's corporate headquarters are located at 4828 Loop Central DR, Houston Texas.  In June 2003, Goldman Sachs Group, the parent of LITTON, sold LITTON to Defendant OCWEN.  At that time, LITTON was servicing corporation formed under the laws of Florida.

42.      Defendant  ONEWEST  BANK  ("ONEWEST")  is  a  corporation  formed under the laws of California.  ONEWEST's  corporate  headquarters are located at 888 East Walnut Street, Pasadena, California.  IndyMac Mortgage Services operates as a division of ONEWEST.  In June 2013 ONEWEST sold $78 billion in mortgage servicing rights to OCWEN. TC's  corporate  headquarters are located at 2100 ALTERNATE US 19 N, North Palm Harbor, Florida.

43.      Defendant OCWEN LOAN SERVICING, LLC ("OCWEN") is a

corporation formed under the laws of Florida. OCWEN's corporate headquarters are located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida.

44. Defendant ORION FINANCIAL GROUP, INC. ("ORION") is a corporation formed under the laws of Colorado. ORION's corporate headquarters are located at 8533 Church Ranch Blvd, #150, Bromfield, Colorado.

45. Defendant SAXON MORTGAGE SERVICES, INC. ("SAXON") is a corporation formed under the laws of the State of Delaware.  SAXON's corporate headquarters are located at 4708 Mercantile Drive, Fort Worth, Texas.

46. Defendant SECURITIES CONNECTION INC. ("SCI") is a corporation formed under the laws of Idaho.  SCI's headquarters are located in Boise, Idaho.

47. Defendant SELECT PORTFOLIO SERVICES INC ("SELECT PORTFOLIO") is a corporation formed under the laws of Utah. SELECT PORTFOLIO's headquarters are located at 3815 S. West Temple, Salt Lake City, Utah.

48. Defendant U.S. BANK NATIONAL ASSOCIATION ("U.S. BANK") is a national bank.  U.S. BANK is a subsidiary of U.S. BANCORP.  U.S. BANK's corporate headquarters are located at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, Minnesota.

49. Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION ("WELLS FARGO") is a national bank.   WELLS FARGO is a subsidiary of WELLS FARGO & COMPANY, with corporate headquarters in San Francisco, California. WELLS FARGO's corporate headquarters is located at 101 North Phillips Avenue, Sioux Falls, South Dakota.

50. Defendant WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY ("WELLS/ASC") is a corporation formed under the laws of the State of Delaware.  WELLS/ASC is a division of Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION, which is a subsidiary of WELLS FARGO & COMPANY, with a corporate headquarters in San Francisco, California.  WELLS/ASC's corporate headquarters are located at 3476 Stateview Boulevard, Fort Mill, South Carolina.

51. Upon information and belief, Defendants John Doe Corporations 1 through 100 are corporations the names and addresses of which are unknown.  Defendants John Doe Corporations include mortgage foreclosure servicing companies and servicers, custodians, and trustees of MBS Trusts.

RICO COMPLAINT                     12

--

IV.    BACKGROUND

   A. <u>REAL ESTATE SALE, MORTGAGE FINANCE & FORECLOSURE  PROCEDURES</u>

   57.    This case began with Relator's purchase of a home in Florida financed with a mortgage followed by a subsequent foreclosure case based on forged documents. Relator's investigations revealed that Defendants' practices in this specific case occurred in numerous other cases, tainting foreclosures nationwide.

    58.    Generally, to finance the purchase and sale of real estate, the buyer borrows money from a bank or mortgage company.  The borrower signs a promissory note secured by a mortgage on the property, which is recorded as a lien against the home.  The note and mortgage are signed by the borrower and by an officer of the bank or mortgage company which originates the loan, i.e., the lender.

   59.    The lender records the mortgage as a lien against the property by filing a copy with the county recorder's office in the county in which the property is located.  Any transfer of a note and mortgage to a subsequent purchaser is accomplished by the endorsement of the note and the assignment of the mortgage.

   60.    The note is endorsed on the last page if space permits or, if there is insufficient space, on the back page or by a separate endorsement page, known in the mortgage industry as an allonge, permanently secured to the note.  The mortgage is assigned according to the laws of each state, which often require that the document have the title "Mortgage Assignment."  Some states limit the ability of a corporation to assign a mortgage to certain officers of that corporation. Mortgage assignments are signed by the grantor/assignor, whose signature is almost always witnessed and notarized.

   61.    A subsequent purchaser traditionally records its ownership of the note and mortgage by filing the assignment with the county recorder's office.  But in the case of the mortgage-backed securities trusts, recording of the assignments rarely occurred.

   62.    If the borrower defaults on the payments, the lender, or a new owner of the note and mortgage, can bring a foreclosure action in state court3 to obtain a court order for the auction of the property, and in this manner can receive payment on the loan by sale of the asset.  In a foreclosure lawsuit, the plaintiff must prove that the property is subject to a note and mortgage, that the plaintiff is the entity that lawfully owns the note and mortgage, and that a default by non-payment has occurred.

RICO COMPLAINT                    13

--

**B.** **DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT**

63.     Defendants created mortgage-backed securities that lacked lawful assignments and other documents of the mortgages underlying. Defendants then created – or had created – fraudulent mortgage assignments and note endorsements to use in foreclosures and submissions to HUD.

64.     The MBS Trusts paid for these fraudulent documents with trust revenues that would otherwise have been distributed to the investors, including the Government Plaintiffs. Similarly, Defendants charged HUD for fraudulent documents used in connection with claims on mortgage guarantees. Defendants HSBC, US BANK, and BONY also used fraudulent documents in cases where the loans had not been securitized, but had been purchased by these banks from By 2008, at the latest, the Defendants knew that documents were often not delivered to the trusts as promised by the originators. This occurred so commonly that the industry coined a term, exception reports, to describe documents missing from loan pools. These exception reports were simply a listing, by trust, of all of the documents missing from each trust.

65.     Thus, when American Home Mortgage in Melville, New York, filed for bankruptcy (Case No. 07-11047 (CSS)), Defendant DBNTC filed a proof of claim, dated January 11, 2008, in the case, claiming that the trusts it administered would need to be compensated billions of dollars because of missing loan documents. Paragraph 16 of that proof of claim states:

> The Trustee or other document custodian has furnished Debtors, on an ongoing basis, document exception reports with respect to missing or defective loan file documents. A copy of the Exception Report Summary for some of the Trusts is attached hereto as Schedule A-4. The Trustee is informed and believes that Debtors are in possession of additional document exception reports from other document custodians. As of the most recent reports, there exist missing or defective loan file documents for several billion dollars in original principal amount of loans….

66.     DEFENDANTS manufactured, caused to be manufactured, or purchased and used fraudulent mortgage assignments, notes, and note endorsements in hundreds of thousands of foreclosure and bankruptcy cases throughout the country.

67.     DEFENDANTS used the fraudulent documents to conceal from the MBS Trust investors, including the Government Plaintiffs, courts, homeowners, and HUD the enormity of the problem of missing loan documents. After discovering the forged mortgage assignment in Relator's Foreclosure, Relator investigated thousands of mortgage assignments prepared by the mortgage foreclosure/document preparer Defendant DOCX and others and found the same forged assignments in all of these cases.

68.     An investigation thereafter uncovered that reviewed mortgage assignments that were prepared by DOCX and notarized during a single day, July 30, 2009, from 13 Florida counties ((1) Broward, (2) Escambia, (3) Hillsborough, (4) Lake, (5) Lee, (6) Marion, (7) Martin, (8) Miami-Dade, (9) Nassau, (10) Osceola, (11) Palm Beach, (12) Sarasota, and (13) St. Lucie). Her analysis showed that DOCX prepared a high volume of mortgage assignments for trusts that used AHMS as the mortgage servicer and LPS as the default management company. The grantees on most of the assignments prepared on July 30, 2009, and reviewed by the Relator were MBS Trusts that used Defendants DBNTC, U.S. BANK, or WELLS FARGO as trustees and AHMS as servicer. 137. The assignments were prepared and filed only in those cases where foreclosure was likely, due to the default in payments by the borrower/homeowners. When the loans went into default, AHMS hired LPS, which in turn retained and supervised the law firms that filed most of the foreclosure actions on behalf of the trusts and used the forged LPS documentation, or assignments fabricated at their own lawfirms, to pursue these foreclosures.

69.     Each of the thousands of assignments from July 30, 2009 had the purported signatures Linda Green and Tywanna Thomas, two employees from DOCX's Georgia office, as officers of the bank or corporation identified on the assignment as the grantor. 139. On each assignment from July 30, 2009, the signature of Linda Green was witnessed by Dawn Williams and the signature of Tywanna Thomas was witnessed by Christina Huang. 140. With one exception, each of the assignments prepared on July 30, 2009 was notarized by the same notary, Chris Ivey, in Fulton County, Georgia. Using her handwriting analysis skills, Relator was able to identify three distinct variations of the Linda Green signature on the assignments prepared on July 30, 2009.

70.     On DOCX-prepared mortgage assignments, at least 18 different job titles are listed for Linda Green, with different titles assigned to Green even on the same day. Titles attributed to Green include the Vice President, Loan Documentation, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.;  Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;  Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;  Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;  Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for HLB Mortgage; Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;  Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for AIIM Mortgage;  Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;  Vice President & Asst. Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Corporation; x Vice President, Option One Mortgage Corporation;  Vice President, American Home Mortgage Servicing, Inc.;  Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;  Vice President, Argent Mortgage Company, LLC by Citi Residential Lending Inc., attorney-in-fact;  Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation;  Vice President of Optimum Mortgage Group LLC by Sand Canyon Corporation f/k/a Option One Mortgage Corporation as Attorney-in-Fact;  Vice President of Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT1, AssetBacked Certificates, Series 2006-OPTI; x Vice President, Amtrust Funsing (sic) Services, Inc., by American Home Mortgage Servicing, Inc. as Attorney-in-fact; and  Vice President, Seattle Mortgage Company.

71.     The use of so many different corporate titles for Linda Green shows it is unlikely that she was actually the officer of any of the named companies; Linda Green lacked corporate authority to sign the documents of behalf of these companies. Further, Linda Green did not sign all of the documents to which her name is affixed. Relator's analysis shows that at least eight different persons have signed on the DOCX-prepared assignments as "Linda Green." Because so

many people signed mortgage assignment documents using the name Linda Green, the notarization of those signatures is clearly unreliable and fraudulent.

72.     Attached as Exhibit B is a list of Robosigners used by DEFENDANTS to procure numerous fraudulent and forged assignments to themselves to proceed with Foreclosure and Eviction. To date, DEFENDANTS continue with the same fraudulent pattern and practice of unlawfully seizing large numbers of homes form American homeowner each day, especially after Covid mandates ceased homeowners have been unable to defend solely because DEFENDANTS and Courts have and continue to allow it, each lining their pockets while Americans are becoming homeless before the Banks exit right again as Credit Suisse has now done to avoid liability.

73.     Credit Suisse aka Select Portfolio Services found guilty of money laundering having to pay 37.5 thereafter shutting down in March stating they plan to sell off their portfolios to foreign investors. Credit Suisse ties to disgraced executives, fraudsters, traffickers aka clients: Bulgarian cocaine trafficking gang the bank was convicted in June of failing to prevent money laundering; former Georgian Prime Minister Bidzina Ivanishvili and his family; Panama Papers and corruption; Antonio Horta-Osorio Archegos Capital Management defaulted in March 2021; Credit Suisse CEO Tidjane Thiam was forced to quit in March 2020 after an investigation found the bank hired private detectives to spy on its former head of wealth management Iqbal Kahn, Hong Kong stock exchange Ronald Le Fook-shiu convicted of taking bribes; Rodoljub Radulovic, Serbian securities fraudster indicted by US and Exchange commission;  Stefan Sederholm a convicted human trafficker in the Philippines; Philippine dictator Ferdinand and Imelda Marcos holding accounts in fake names; Nigerian dictator Sani Abacha who stole over $5bn from his people; Marcoses; Abachas; Corrupt Ukraine prime minister Pavlo Lazarenko; Egyptian dictor Hosni Mubarak and sons Alaa and Gamal;  Hosni Mubarak who had ties to Hussein Salem; billionaire politician in Mubarak's party Hisham Talaat Moustafa, former spy chief Omar Suleiman feared in Egypt due to widespread torture and human rights abuses; intelligence and military figures and family members from Pakistan, Jordan, Yemen and Iraq; Algerian prior minister of defense Khaled Nezzar accused of disappearances, mass detentions, torture and executions and human rights abuses; Roberto Rincon Fernandez and Abraham Shiera Bastidas with Venezuelan ties

MERS AND MERSCORP DO NOT ENDORSE ASSIGNMENTS

74.     On November 16, 2010, President and ECO of MERSCORP, Inc, R.K. Arnold, testified before the Senate Committee on the Banking, Housing and Urban Affairs evidencing MERS is merely a straw Organization owned by the same Banks committing the fraud.

75.     MERS is a member-based organization made up of about 3,000 mortgage lenders. It maintains a nationwide database that tracks changes in servicing rights and ownership interests in mortgage loans. Today MERS is keeping track of 31 million active loans.

76.     The MERS System was conceived in 1993 by a group of leading mortgage market participants, including the Mortgage Bankers Association, the Federal National Mortgage Association, the Federal Housing Administration, the Department of Veteran Affairs, JP Morgan Chase, Bank of America, and Wells Fargo Bank, that were looking for an efficient and reliable system for tracking transfers of residential mortgages in the increasingly securitized mortgage market. What emerged was a system whereby MERS, a wholly-owned subsidiary of MERSCORP Holdings, is designated as the mortgagee of record serving for loans registered in the MERS System. MERS does not hold the promissory note, which means that it holds no beneficial interest in the loan transactions or right of repayment; it merely serves as nominee for the lender and the lender's successors and assigns.

77.     MERS functions as a centralized electronic registry of mortgages, and it was supposed to track the ownership of these mortgages, which are typically sold multiple times during  Mortgage Deed Where's the "IOU" for the mortgage debt? the loan's life. MERS potentially affects upwards of 60 million residential mortgage loans nationwide, and almost completely crashed the U.S. housing market by itself because of so many problems with the packages. MERS was created by lenders and title insurance companies, so it would be easier to transfer the beneficial interests to other secondary market lenders. Yet, some mortgages ended up significantly discounted due to packaging problems, which made them inactive.The MERS database is important to individual borrowers because it provides a free and accessible resource where borrowers can locate their servicers, and in many cases, learn who their note-owner is as they change over time.

RICO COMPLAINT                              18

--

78.    The MERS database is important to communities because housing code enforcement officers use it to identify who is responsible for maintaining vacant properties. The MERS database aids law enforcement in the detection of mortgage fraud by tracking liens taken out utilizing the same borrower name, social security number, or property.

79.    MERS also performs another key function: It serves as the mortgagee of record, or the holder of mortgage liens, on behalf of its members as a common agent. MERS is designated as the mortgagee in the mortgage document, and this designation is approved by the borrower at loan closing and then recorded in the appropriate local land records. Serving as the mortgagee enables MERS to receive and maintain updated information as loan servicers and noteholders change over time because we are the central clearinghouse for receipt of mail as mortgagee. One thing that is always clear in a mortgage document is that if the borrower defaults on his obligation, the lender can foreclose. If MERS holds the mortgage lien, foreclosures can occur in two ways: Either the MERS mortgage interest is reassigned in the land records to the lender holding the note and the lender initiates the action on its own, or MERS initiates the action as the mortgagee of record in the land records.

78.    To do this, MERS relies on specially designated employees of its members, called certifying officers, to handle the foreclosure. To be a MERS certifying officer, one must be an officer of the member institution who is familiar with the functions to be performed, and who has passed an examination administered by MERS. Generally, these are the same individuals who would handle the foreclosure if the lender was involved without MERS. The loan file remains with the servicer as it did before MERS. MERS is not a repository for mortgage documents or promissory notes.

79.    MERS derives its revenues entirely from fees charged to its members—it makes no money from foreclosures. And MERS does not decide when to foreclose. Foreclosure must be authorized by the note-owner (or noteholder), and it must be done in accordance with our strict rules and procedures, which we regularly enforce and refine. For example, it is a key MERS rule that the note must be presented in a foreclosure, which some states do not require. And we prohibited the use of lost note affidavits in foreclosures done by MERS once we learned they were being used as an excuse to not produce the note.

80.     Earlier this year, when we became aware of acceleration in foreclosure document processing, we grew concerned that some certifying officers might have been pressured to perform their responsibilities in a manner inconsistent with our rules. When we did not get the assurances we thought were appropriate to keep this from happening, we suspended our relationships with those companies.

81.     When we discovered that some so-called "robo-signers" were MERS certifying officers, we suspended their authority until they could be retrained and retested. We are asking our members to provide us with specific plans outlining how they intend to prevent such actions in the future.

82.     Mr. Chairman, all of us at MERS keenly understand that while owning your own home is a dream, losing that home is a nightmare. As professionals who have dedicated ourselves to helping people realize their dream, we are deeply dismayed by the current foreclosure crisis.

83.     Missing documents, notary fraud, and "robo-signing" led the way. There was a lot of chaos involved with MERS mortgage packets, which contained no original promissory notes (the "IOU" for the mortgage debt) in these same MERS files.

84.     Knowledgeable homeowners were able to completely stop their home foreclosures by pointing out that the foreclosing entity, such as the mortgage servicing company, didn't have a legal right to foreclose on their homes, since they didn't have all of their valid mortgage paperwork in their files. These questionable ownership interests in the mortgages led to foreclosure moratoriums, court settlements, and inactive statuses.

85.     There were a large number of allegations of notary fraud in which real or fake notaries such as "Linda Green" were allegedly part of the massive "Robo-Signing Scandal" nationwide. It has been suggested that promissory notes, deeds of trust or mortgages, and other loan or title documents were forged, left blank, or illegally assigned to numerous mortgage investors. Since MERS was set up to become as paperless, speedy, and efficient as possible, there was not enough third party oversight to check whether these documents were valid.

86.     MERS CEO R.K. Arnold further testified that MERS does not receive or maintain either the mortgage or the promissory note. Every time a note or servicer changes hands, a notation of that change is made (electronically) on the MERS® System by the members involved

in the sale. In this way, changes in servicing rights and beneficial ownership interest in the promissory note are tracked over the life of the loan.

87.     A fundamental legal principle is that the mortgage follows the note, which means that as the note changes hands, the mortgage remains connected to it legally even though it is not physically attached. In other words, the promissory note is enforceable against the property because of the mortgage, but the mortgage instrument itself is not independently enforceable as a debt. This principle is not changed when MERS is the mortgagee because of the agency relationship between MERS and the lender.

88.     The promissory note is not (and never has been) recorded or stored with the county land records office. The note is a negotiable instrument that can be bought and sold by endorsement and delivery from the seller to the note purchaser. This activity is governed in all fifty states by the Uniform Commercial Code (UCC) Article 3.

89.     MERS tracks mortgage loans through an 18-digit identification number called the Mortgage Identification Number (MIN). With one notable exception, the MIN is to a specific home loan what the VIN (Vehicle Identification Number) is to an individual automobile. Like the VIN, the MIN can be assigned at the earliest stage of the product's creation and stays with it for its entire life.

90.     MERS has strict rules and procedures governing foreclosure, most notably a requirement that the certifying officer be in possession of the mortgage note when foreclosing in the name of MERS. In addition, pursuant to a 2006 MERS membership rule, no foreclosures in the name of MERS are allowed. In the event a MERS member contracts out foreclosure operations to a vendor or a law firm, a separate contract is entered into by MERS, the MERS member and the contracted firm for the purpose of establishing our understanding of the obligations of the parties and for the purposes of designating certifying officers.

91.     When servicing rights or promissory notes are sold for loans where MERS is not the mortgagee, the usual practice is for the seller to execute and record an instrument assigning the mortgage lien to the purchaser (commonly referred to as an "assignment"). Assignments are not required by law to be recorded in the land records. The primary reason assignments are recorded (in cases where MERS is not the mortgagee), stems from the appointment of

servicers to administer the loan on behalf of the mortgage loan owner, provide notice to the homeowner and prevent anyone from seizing the property with fraudulent and forged documents.

92.    The theory was that the need for an assignment is eliminated because title to the mortgage lien has been grounded in MERS. Moreover, transfers of mortgage notes and servicing rights are not recordable transactions (and have never been reflected in the land records) because they are not a conveyance of an interest in real property that is entitled to be recorded; only the transfer of the lien is a conveyance. A promissory note is sold by endorsing the note, and delivering it to the purchasers. Servicing rights are non- recordable contracts rights. Mortgage Electronic Registration Systems, Inc. remains the mortgagee regardless of the number of these non-recordable transfers that may occur during the life of the loan. Upon such sales, the seller and purchaser update the MERS® System of the transfer with an "electronic handshake." If the purchaser does not confirm the transaction, it is flagged by the MERS® System for follow-up. MERS also audits its members for the accuracy of the information they provide to the MERS® System. The only reason servicers needed to appear in the county land records before MERS was so they could receive legal notices pertaining to the property. That role is now played by MERS as their common agent.

93.    However, this is not what has happened. As evidenced, DEFENDANTS have already admitted and Government Officials have found that DEFENDANTS all intentionally destroyed the mortgages and notes to the loans transferred into these MBS Trusts listed in Exhibit A to further conceal the fraudulent acts of DEFENDANTS and their employees and agents that made it out of the banking crises with millions in their pockets, escaping liability left to the American homeowner to deal with.

94.    MERS Rule 2 states that no Member may register or attempt to register any transaction not authorized under the Governing Documents or permitted by MERSCORP.

95.    Rule 2, Section 1, each Member shall register a MERS Loan and may register any other mortgage loan on the MERS® System as an iRegistration. Any mortgage loan or MERS Loan registered on the MERS® System shall reflect any and all applicable transactions with respect to such loans to which such Member is a party, in accordance with the Procedures

RICO COMPLAINT                                        22

96.     Section 3. For a MERS Loan to remain active in the MERS® System, the designated Servicer and Note Owner must be Members. The transfer of contractual servicing rights and/or beneficial ownership interests to a non-Member with respect to a mortgage loan registered on the MERS® System shall require the Deactivation of such mortgage loan from the MERS® System in accordance with the Governing Documents.

97.     Section 4. For a MERS Loan, each Member, at its own expense, shall cause "Mortgage Electronic Registration Systems, Inc." to appear in the applicable public land records as the Mortgagee of Record as Nominee for the Note Owner and its successors and/or assigns with respect to each mortgage loan that the Member registers on the MERS® System. At the time that a MERS Loan is registered on the MERS® System, the Member shall use commercially reasonable efforts to verify that it has complied with the preceding sentence, which shall be satisfied by verifying that the information in the applicable public land records and on the MERS® System, as specified in the Procedures, is consistent. Each Member shall maintain an adequate quality assurance program to ensure that the foregoing verification procedures are effective. Upon a Member becoming aware of any discrepancy between the information shown on the MERS® System and the information in the applicable public land records, the Member shall promptly correct the discrepancy. Loans designated as iRegistration on the MERS® System shall be excluded from the requirements of this Section.

98.     Section 5. (a) MERS shall act as the Nominee of the Note Owner and the Note Owner's successors and/or assigns, including the Note Holder with respect to each MERS Loan that a Member registers on the MERS® System. Upon transfer of any MERS Loan to a person who is not a Member, MERS, acting on behalf of the selling Member, shall assign the related Mortgage or Security Instrument in question to such non-member and record such assignment.

99.     MERS rules further state that in the absence of contrary instructions from the Note Owner, MERSCORP and MERS may rely on instructions from the Servicer or Subservicer shown on the MERS® System in accordance with these Rules and the Procedures with respect to transfers of **legal title** of the Note or Mortgage, transfers of contractual servicing rights, and releases of any security interests applicable to such mortgage loan.

RICO COMPLAINT                                              23

100.    However, the Note Owner may give instructions that are contrary to those provided by the Servicer and/or the Subservicer that shall supersede all previous instructions by any other Member; provided, however, the Note Owner must deliver such contrary instructions to MERSCORP in writing (or electronically in an email at an e-mail address specified by MERSCORP) and the MERS Entities may each rely on such instructions until receipt of further written instructions from the Note Owner.

101.    MERS rules further state that if the MERS Entities receive a request from a third party to release a lien for a loan that either (1) is not registered on the MERS® System or (2) is registered on the MERS® System to an inactive Member as Servicer, Subservicer, or Investor, the MERS Entities shall take reasonable steps to determine if the loan has been paid in full. If the MERS Entities determine that the loan has been paid in full, or are unable to determine whether or not the loan has been paid in full after taking such reasonable steps, MERS may release the lien for such loan.

102.    Section 7 of MERS Rules further state the MERS Entities and the Member agree that: (1) the MERS® System is not a mechanism for creating or transferring liens or interests in mortgage loans, and (2) MERS® System membership or a Member's use of the MERS® System shall not modify or supersede any agreement between or among the Members and/or any other parties having liens or interests in mortgage loans registered on the MERS® System. Actual transfers of liens to or from MERS in the mortgage loans are reflected in the public land records as described in this Rule.

103.    Mortgage loans registered on the MERS® System where actual transfers of liens to or from MERS in the mortgage loans are reflected in the public land records as described in this Rule. C.  In the event the Servicer and Subservicer are no longer active Members, MERSCORP

shall forward Urgent Mail to the Investor, as reflected on the MERS® System.

104.    Section 3. Upon request from the Member in accordance with the Procedures, MERS shall furnish to the Member a duly authorized MERS Corporate Resolution appointing one or more officers of such Member (or for Members that do not have officers in their organizational structure, then employees who would be considered the equivalent of officers and who possess a

level of authority ordinarily reserved for officers), selected by such Member, as MERS Signing Officers. Such MERS Corporate Resolution shall grant MERS Signing Officers the limited authority to take action as officers of MERS as prescribed by the MERS Corporate Resolution. MERS shall respond to such request within three business days of receipt. All actions required to be taken by Members under these Rules to release, discharge, assign or convey a Mortgage, Deed of Trust or other form of security instrument in the public land records shall be taken by and through a MERS Signing Officer or a MERS Corporate Officer in the name of MERS as Mortgagee of Record.

105.    If a MERS Entity receives any reimbursement from a fidelity bond or insurance policy, either for payments on an Indemnified Claim or for any loss of principal or interest on a MERS Loan, the proceeds shall be held in trust for and promptly paid to the Member who is shown as the Servicer on the MERS® System on behalf of the Note Owner, unless otherwise instructed by the Note Owner.

106.    Transfer Fees. If a Member sells or otherwise transfers the contractual rights to service a loan registered on the MERS® System to another Member, then the transferring Member shall reflect such transfer on the MERS® System in accordance with these Rules and Procedures and a Seasoned Servicing Transfer Fee in the amount specified in the MERS® System Pricing Schedule in effect at the time the transfer is effective shall be due to MERSCORP for each loan transferred if the transfer date is more than 270 days from the Note Date for that loan. An Intracompany Transfer shall be subject to an Intracompany Transfer Fee for each loan transferred in the amount specified in the MERS® System Pricing Schedule in effect at the time the transfer is effective if the transfer date is more than 270 days from the Note Date for that loan.

107.    In the event of any conflict between the Rules and any other document in the Governing Documents, the provisions of the Rules shall control. Members shall be bound by and agree to the Rules and Procedures—as well as any changes made to the Rules and Procedures under this Rule—in the same manner as they are bound by and agree to the provisions of all Governing Documents.

108.    If a MERS Loan has not been registered on the MERS® System and the transferor is unable to register the mortgage loan due to bankruptcy, receivership, conservatorship, or because the transferor is no longer in business or cannot otherwise be located or contacted, then the transferee must register the mortgage loan and pay the corresponding registration fee pursuant to Rule 5, Section 1(a). If the transferee fails to pay any registration fees (1) within 60 days of the payment due date and (2) after notice of delinquency at approximately 30 days after the due date, and if such fees are not being disputed in good faith by the transferee, the transferee may be subject to Lockout from the MERS® System pending full payment of all outstanding balances

109.    Costs for Litigation-Related Expenses. MERSCORP shall have the authority to charge a Member for any litigation-related expenses that are caused directly by the Member or incurred at the Member's request. These litigation-related expenses may include, without limitation, the cost of producing records pursuant to a subpoena, court order, or other legal process in any litigation or other legal proceeding to which the Member is a party (and in which the MERS Entities are not named as parties) or in which records relating to the Member are required to be produced, whether such production is compelled by the Member or by any other person that is a legitimate participant in such request, demand, or proceeding.

110.    After the Lockout Warning Period, if the Member has not remediated the Violation to MERSCORP's reasonable satisfaction and paid any imposed monetary penalty, MERSCORP may subject the Member to Lockout from the MERS® System. The Member shall then have 30 days to remediate the Violation and pay any imposed monetary penalty before Termination (the "Lockout Period").

111.    Termination. After the Lockout Period, if the Member has not remediated the Violation to MERSCORP's reasonable satisfaction and paid any imposed monetary penalty, or has not resigned its MERS® System membership, MERSCORP may terminate the Member's MERS® System membership in accordance with Rule 1 and the Procedures.

112.    **Plaintiff in the instant case can uncontroverted proof that the current loan on her property is a fraudulent loan procured by fraud by DEFENDANTS and 3rd parties who were the only parties to benefit from a loan that DEFENDANTS all failed to register with MERS as fraudulently stated in the Deed of Trust.**

--

VIRTUAL BANK DEED OF TRUST

DEED OF TRUST
    Filed:               AUGUST 3, 2006 with SD County Recorders Office;
    Filing Request by:   FIDELITY NATIONAL TITLE, SAN DIEGO OFFICE
    Deed DOC#     2006-0551257

DEED PREPARED BY:
CANDICE CORRIGAN
3801 PGA Blvd
Suite 700
Palm Beach Gardens, FL 33410
(Handwritten #275259-4 below address by unknown 3rd Party)

MIN #100257000001064912 on Virtual Bank Deed of Trust has been inactive since 7/21/2006 and is not registered to Virtual Bank or with MERS

Inactive MIN # confirmed on April 26, 2022, by Sierra Straw, Title Assistant employed with Fidelity National Title Company located at 7565 Mission Valley Road #100, San Diego, CA 92108 via telephone conversations with Michelle Gold and via an email attachment specifically displaying MERS "MIN STATUS: Inactive" for "MIN #100257000001064912" on "Note Date: 07/21/2006" "Servicer: JPMorgan Chase Bank, N.A. fka WAMU Monroe, LA"

2022 Letter from Lynan Bank aka Virtual Bank confirms no loan exists in Plaintiffs name or in Trust or registered with MERS.

113.    **MERS database and mortgage records, and PLAINTIFFS deed of trust with Virtual Bank aka Lydan Bank, were never registered with MERS.** Thus, all assignments and transfers endorsed by US Bank, SPS and National Default and their robosigners are void on their face and must be rescinded forthwith. PLAINTIFF discovered have been endorsed solely by US BANK, SPS and NATIONAL DEFAULT robosigners giving themselves a false title to proceed with foreclosure. Thus, all transfers are void on their face.

114.    DEFENDANTS have at all times been unable to produce a clear Chain of Title for any of Plaintiff's 3 sole and separate real properties that DEFENDANTS illegal transferred, refinanced, sold and now, attempting to seize via a foreclosure, evidencing over $900,000 of missing funds DEFENDANTS embezzled, pilfered and/or stole for their sole benefits leaving PLAINTIFFS do deal this issues in this case. DEFENDANTS cannot produce a clear chain of title on PLAINTIFFS property because the alleged existing loan never existed or was terminated in 2006.

115.   DEFENDANTS US BANK, SPS and NATIONAL DEFAULT SERVICES, STEVEN BRUCE GOLD; ARLENE MARIE ARIAS aka ARLENE MARIE CAMPBELL; HAROLD G. CAMPBELL; KARL SCHORR,; JOE SOECKER; MATTHEW D. MURPHEY; TROUTMAN SANDERS LLP; ROBERT PIZZUTO; SUSAN R. SAKHAI; RALPH HUGHES; GEORGE E. OLMSTEAD; TYLER W. CRAMER; HUGHES & PIZZUTO, A.P.C. aka OLMSTEAD, CRAMER & PIZZUTO, conspired and to date are working in concert with each other, and all other DEFENDANTS, owed a fiduciary or contractual duty to PLAINTIFFS and all breached their duties and/or contractual obligations.  DEFENDANTS have no interest or claim in PLAINTIFFS sole and separate assets, including property at issue. DEFENDANTS all have opened accounts under 3rd parties, and laundering funds embezzled from The Gold Firm client Trust accounts. The California Judicial Council and State Bar have refused to investigate and allowed to continue. DEFENDANTS have and continue to produce, created, forged, and filed numerous false and fraudulent documents filed in 5 separate courthouses thwarting PLAINTIFFS ability to clear title to her property at issue or trace her assets. San Diego Superior Court Judges who have never been elected by the people, prosecutors and law enforcement with ties to same racketeering organization stretching tracing back to 2000 evidence a pattern of practice of embezzlement, seizure, money laundering, and unlawful transfers through Trust Accounts controlled by judges and court appointed experts in family law cases. DEFENDANTS acts in thwarting her ability to trace missing funds embezzled from The Gold Firm client trust account led to the discovery of the Judicial and Law Enforcement racketeering organization tracing back 20 years. (Open California FBI cases already investigating same conduct in other jurisdictions) Actions of Judicial Officers led to the discovery of over 150 concealed bank and financial accounts Steven Gold opened in his sole name and/or in the name of 3rd parties to embezzle missing and unknown sources of funds. Defendants continue to conceal the criminal acts of each other and funds being laundered continue to flow through US and foreign accounts. In an attempt to further conceal the above discovered racketeering organizations, members and criminal act, Steve Gold has engaged in several attempts of murder and murder for hire Sheriffs and Courts refuse to investigate. To date, DEFENDANTS continue to seize, foreclose and now attempt to evict PLAINTIFFS from their home with forged and fraudulent documents. These acts violate the the False Document Act.

116.    All loan documents PLAINTIFF has obtained to date, like many others nationwide, have been modified, forged and/or altered while in the custody and control of DEFENDANTS, loan officers, agents, title companies and/or unauthorized 3rd parties, depleting over $350,000 of equity that benefited each of them leaving PLAINTIFF with the liability on a $600,000 junk loan DEFENDANTS allegedly immediately transferred into junk MBS Trusts.

116. Pursuant to PLAINTIFFS legal rights, PLAINTIFF have since reported the fraud and rescinded the loan. DEFENDANTS, in furtherance of funding and concealing the racketeering organization set up and continue to use these racketeering criminal practices to seize property from unsuspecting or less educated American Homeowners DEFENDANTS at all times planned to sell to foreign investors as agreed upon in 2006.

### III. PRAYER FOR RELIEF WHEREFORE,

PLAINTIFFS each requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 et seq.;

b. Defendants pay an amount equal to three times the amount of damages Plaintiffs have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,000, and not more than $10,000 for each violation of 31 U.S.C. § 3729 and similar provisions of the State False Claims Acts, California False Claims Act; Plaintiffs (and potential Class) further request an award of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts; d. Plaintiffs to be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts; e. Plaintiffs be granted all such other relief afforded by law as the Court deems appropriate;

### VI. REQUEST FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PLAINTIFFS hereby demand a trial by jury.

Dated July 21, 2023                         s/Michelle Gold, Esq.

_____
Michelle Gold, Esq.
PO Box 1314
Bonita, CA 91908

RICO COMPLAINT                              29

--